OPINION OF THE COURT
Gary J. Weber, J.
The defendants have made oral and written application for an in camera inspection of the Grand Jury proceeding and a determination as to the sufficiency of the record to sustain the charges against them.
The People have consented to such inspection and have submitted the Grand Jury minutes for the presentation.
In examining the minutes a two-prong test must be satisfied as to each defendant with respect to each count of the indictment. First, a prima facie case must be presented (People v Mayo, 36 NY2d 1002). Second, the District Attorney is required to instruct the Grand Jury on the law with respect to the matters before it. (CPL 190.25 [6].) It is "sufficient if the District Attorney provides the Grand Jury with enough information to enable it * * * to decide whether * * * there exists legally sufficient evidence to establish the material elements of the crime” (People v Calbud, Inc., 49 NY2d 389, 394-395).
I
THE ALLEGED LARCENIES WHERE NO FRAUD WAS DEMONSTRATED

Scenario "A”

These counts charge the defendants Mount Hope, Boyle and Petrosky with first and second degree grand larceny in conjunction with payments made by Mobil Oil Corporation (hereinafter Mobil), the Jacobson Shipyard (hereinafter Jacobson), the Government Service Administration (hereinafter Government) and the Sandoz Pharmaceutical Corporation (hereinafter Sandoz). The prosecution’s general theory with regard to *781 these alleged larcenies is hereinafter referred to as Scenario "A”.
It is the theory of the prosecution that criminal liability attached to the actions of the defendants because the money which the defendants obtained as a result of the transactions involving Mobil, Jacobson, Government and Sandoz was paid as a result of either trick or device, false promise, or some combination of both.
In support of this contention the District Attorney adduced evidence before the Grand Jury to the effect that the defendants either acting directly or through others made both oral and written presentations to the effect that their new process made "tremendous steps” toward reducing the impact of underground tank discharges so as to protect "our land, air and water” and to promote their services as "today’s solution to yesterday’s pollution”.
Upon examination of the record it is evident that these generators* only sought a disposition of their petroleum contaminated sand and soil (PCS) which would absolve them from liability both in terms of their obligation to remove the material from their premises pursuant to ECL article 17, title 10, Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) (42 USC § 9601 et seq.), and other such similar laws and at the same time avoid the continuing sanctions pursuant to these laws which could follow if the material, having been taken off the sites owned or controlled by the generators, was improperly reintroduced into the waste stream.
This is not to say that deceit and misrepresentations by the defendants in connection with the genuine concerns of the generators relating to potential liability on their part for the malfeasance or nonfeasance of the defendants could not, under any circumstances, give rise to criminal liability on a larceny theory. It is only to say that on this record, the only viable larceny theories pertaining to these counts would necessarily involve material misrepresentations and false promises which would go directly to the civil, administrative and criminal liability of the generators or, at the very least, substantially mislead them as to the potential parameters of the same.
*782 The mere fact that some or all of the defendants may have operated at the Mount Hope facility in violation of the terms and conditions of their Department of Environmental Conservation (DEC) permits and associated consent orders does not, ipso facto, constitute a material misrepresentation or false promise giving rise to criminal responsibility, sounding in larceny, no matter that such violations may give rise to civil, criminal or administrative law liability on the part of the defendants in other contexts.
This is so because improprieties by the defendants in the course of their operation with respect to the rules and regulations of the DEC would not necessarily expose the generators to liability of any kind so long as it could not be shown that the PCS produced by them had improperly reentered the waste stream.
While the Mount Hope facility may, indeed, have been unable to satisfactorily account properly to the DEC and other governmental regulatory agencies with respect to the disposition of the total contaminated soil coming to it from all sources, including that received from these generators, it is also true that there is no competent proof in this record that the particular PCS produced by the generators here concerned in Scenario "A” was not treated in accordance with the conditions and requirements laid down by the DEC.
In essence, the District Attorney has sought to equate the duties owed by the defendants to the generators with the duties owed by the defendants to the DEC in terms of strict compliance with its rules and regulations and the applicable permits and consent orders which had been issued by the DEC.
Nowhere in this record nor in the charge to the Grand Jury has it been shown by way of applicable law or statute or by proof of fact that mere noncompliance by the defendants with the rules, regulations, permits or orders of the DEC would, ipso facto, cause these generators to suffer the liability which they so much wanted to avoid.
Nowhere in this record is there proof that these generators did not get exactly that which they had bargained for, namely, a disposition of their PCS in a manner which would leave them free of liability, any incidental violations of DEC laws, rules, regulations or consent orders by the defendants notwithstanding.
*783 II
THE LARCENIES WHERE FRAUD WAS DEMONSTRATED WITHOUT A PROPER SHOWING OF VALUE

Scenario ”B”

In connection with these counts, as opposed to the situation pertaining to the counts above treated, there was sufficient evidence before the Grand Jury to substantiate allegations that the defendants, acting in concert, not only diverted material which was to have been transported to the Mount Hope facility to other unpermitted locations, but also fabricated and falsified documents which deceived and misled the effected generators, or their representatives, into the erroneous belief that their petroleum contaminated soil had been shipped to and disposed of at the Mount Hope facility. Under these circumstances, liability clearly could have accrued to the generators. This theory of liability as applied to these counts is hereinafter referred to as Scenario "B”.
Scenario "B” contrasts sharply with the Scenario "A” where no showing of criminal liability was made.
While it is clear that the evidence presented supports allegations to the effect that there is reasonable cause to believe that certain larcenies may have been committed by the defendants charged with the same as to Scenario "B”, proof of the amount of the alleged larcenies poses a different question.
In order to elevate the larcenies alleged in these three counts beyond the level contemplated by Penal Law § 155.25, petit larceny, adequate proof must appear that the value of the property stolen by the defendants exceeds the sum of $1,000.
Penal Law § 155.05 (1) provides that "[a] person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same for himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof’.
While it is true that proof was adduced as to total sums paid to general contractors who were not involved in any wrongdoing on account of the total sum due for their work, labor and services, some unspecified part of which may have been attributable to charges "dummied up” by the defendants by false and fraudulent business records, no proof was ever adduced as to the actual amount received by the defendants.
*784 As was accurately described by one witness, the defendants appeared "somewhere in that remote subcontracting”.
It avails nothing to assert that Penal Law § 155.05 (1) above cited relating to appropriation to a third person is applicable to this situation because the defendants received their payment (whatever it was) at the end of a chain of contractors and subcontractors who were not associated with the defendants for any unlawful purpose.
The true measure of a larceny of this kind lies in the amount received by the defendants from whatever source the defendant’s unjust compensation was derived, not the total amount received by a general contractor at the top of a chain.
Carried to its extreme, the theory the Grand Jury applied to these counts as they presently appear could result in the indictment of a laborer for grand larceny in the first degree, a class B felony, on a job with a construction cost over $1,000,000 when he only steals a shovel worth $50, simply because the general contractor on the job happened to be paid over a million dollars.
Penal Law § 155.20 (4) provides that "[w]hen the value of property cannot be satisfactorily ascertained pursuant to the standards set forth in subdivisions one and two of this section, its value shall be deemed to be an amount less than [$250]”.
Inasmuch as there is sufficient proof in this record to support a finding of reasonable cause that the defendants stole some amount of money, these counts are reduced as to each defendant pursuant to CPL 210.20 to reflect a charge of petit larceny in violation of Penal Law § 155.25.
Ill
THE SCHEME TO DEFRAUD
This count is applicable to the defendants Mount Hope, Boyle, Petrosky, Disposal, Accardi, Amato and O’Grady in that they are charged with engaging in a scheme constituting a systematic ongoing course of conduct with intent to defraud 10 or more persons by false or fraudulent pretenses, representations or promises, and did so obtain property from one or more persons.
For the reasons earlier stated in this opinion with respect to the sufficiency of counts 8 through 12 of the indictment, the evidence before the Grand Jury was insufficient to support a finding that the general representations made by some defen *785 dants with respect to the beneficial effects of their enterprise upon the environment was anything more than puffery.
There is insufficient evidence to conclude that these representations attributed to the defendants concerning the "tremendous steps” which the defendants were supposedly making to protect "our land, air and water” were material. These claims were in the nature of public relations rhetoric and this record cannot sustain any other interpretation but that they were extraneous and irrelevant to any decision-making process which ultimately led to the inclusion of Disposal and the Mount Hope facility in the chain of contractors and subcontractors who were associated with the removal and disposition of any PCS.
Further, so much of the allegations in this count pertaining to the dumping of 55 gallon cans containing untested liquids by employees of Mount Hope, even if such activities amounted to violations of other laws or regulations, are irrelevant to the legal position of any of the defendants vis-á-vis the supposed victims of the larceny scheme inasmuch as these activities could have no impact on the ultimate liability of the "victims” even under the strict liability imposed by ECL article 17, title 10 and CERCLA (42 USC § 9601 et seq.).
In addition, there is no competent proof in this record to substantiate the contention of the District Attorney that waste obtained from any particular generator was either used as backfill, or spread out on the ground at the facility at the direction of any of the defendants.
In fact, there is testimony to the effect that the defendant Petrosky went so far as to affirmatively direct an employee to remove material which that worker had spread out on the grounds by means of a payloader.
In addition, this count must fail as being duplicitous.
"The key to determining whether a count is duplicitous is whether the fraudulent activity falls within 'one unitary "scheme to defraud” ’.” (People v First Meridian Planning Corp., 201 AD2d 145, 150, citing United States v Mastelotto, 717 F2d 1238, 1244; United States v Zemek, 634 F2d 1159, 1167-1168.)
The defendants named in larceny counts 8 through 12 of the indictment, Scenario "A”, are alleged to have perpetrated a fraud basically founded in misrepresentations concerning compliance with DEC regulations.
As to the defendants concerned in Scenario "A” no compe *786 tent showing has been made that the material associated with the larcenies attributed to them was not properly processed, at least to the degree necessary to eliminate potential liability on the part of its generators.
As was described earlier, the state of facts pertaining to those defendants involved in Scenario "A” is in patent contrast to that applicable to those defendants named in counts 13, 18 and 20 in Scenario "B”.
With respect to the defendants included in Scenario "B” there is competent proof that either they, or those associated with them, actually caused the dumping of PCS at certain places, other than the Mount Hope facility, where such dumping was plainly prohibited.
Moreover, there is reasonable cause to believe that those defendants concerned in Scenario "B” also in one way or another went so far as to falsify certain business records and other related documents for the purpose of deceiving the victims of their alleged larcenies into believing that contaminated soil had been brought to the Mount Hope facility and properly disposed of there when, in fact, it had not.
Inasmuch as the defendants in Scenario "A” included only Mount Hope and two individuals employed by it, this group of defendants would also have been victimized by the actions of the participants in Scenario "B” because the materials diverted from the Mount Hope facility as a part of Scenario "B” should have arrived at the Mount Hope facility pursuant to the representations and contractual arrangements previously made with Mount Hope, in the normal course of business and would have thereby generated a certain amount of incoming revenue for the benefit of Mount Hope.
Since the proof is to the effect that Scenario "B” defendants defrauded the Scenario "A” defendants, it cannot be argued that these two separate scenarios can be placed together to constitute a single, unified fraudulent scheme.
Thus, in examining the indictment the court cannot ascertain as to whether or not this count is based upon a finding supported by Scenario "A” or a separate finding supported by Scenario "B” or a plurality based upon grand juror’s votes relying on both Scenario "A” and "B”.
It is also significant to note that Scenario "A” and "B” contain no defendants in common.
CPL 200.30 (1) provides as follows: "Each count of an indictment may charge one offense only.”
*787 It is for this reason that, in addition to its other fatal infirmities, this count must be held duplicitous.
CONCLUSION
The principal area in which the court takes exception to the sufficiency of these proceedings concerns the application of the larceny statutes in the manner here fashioned by the Grand Jury.
The Legislature has enacted a statutory scheme pursuant to the Environmental Conservation Law which it has deemed appropriate for the purpose of the protection of the environment.
Similarly, the Legislature has enacted criminal laws pertaining to the filing of false instruments and the filing of false business records.
These laws are clearly and plainly applicable to the state of facts presented to the Grand Jury.
A larceny without a victim of a taking may not be created merely from a legal potpourri of unheeded advertising claims and disregarded regulations.
The plain fact is that, while the defendants may have made claims with respect to the benefits which they were bringing to the environment, these claims, by themselves, did not make them, under pain of the larceny statutes, guarantors of compliance with every law, rule, regulation or consent decree promulgated by the DEC.
Moreover, as to those defendants where an act of larceny has been shown, the degree of the theft must be measured by the size of the taking itself.
Even though it may be true that the general contractors concerned in these larceny counts may be viewed, perhaps, as the ultimate cause in a chain of events leading ultimately to a larcenous taking, this fact does not make an otherwise unrelated subcontractor criminally liable for whatever sum the general contractor may have received.
However, this court cannot permit the Grand Jury to proceed beyond the bounds of the four corners of existing law. To do so would be to permit the Grand Jury to legislate.
This District Attorney is directed to file a reduced indictment in accord with this memorandum.

 In some cases the term "generators”, when used in this opinion, does not refer directly to the producers of PCS but is used more broadly to include not only the producers, but also brokers and others who acted in the interests of the producers to bring about the removal of the PCS.